Matthias, J.
Was the decision of the B*oard of Tax Appeals unreasonable or unlawful in that it held that the tobacco of the company in storage in Ohio in the years in question was “used in business,” as that term is defined in Section 5325-1, General Code?
That section is as follows:
“Within the meaning of the term ‘used in business,’ *154 occurring in this title, personal property shall be considered to be ‘used’ when employed or utilized in connection with ordinary or special operations, when acquired or held as means or instruments for carrying on the business, when kept and maintained as a part of a plant capable of operation, whether actually in operation or not, or when stored or kept on hand as material, parts, products or merchandise; but merchandise or agricultural products belonging to a nonresident of this state shall not be considered to be used in business in this state if held in a storage warehouse therein for storage only. Moneys, deposits, investments, accounts receivable and prepaid items, and other taxable intangibles shall be considered to be ‘used’ when they or the avails thereof are being applied, or are intended to be applied in the conduct of the business, whether in this state or elsewhere. ‘Business’ includes all enterprises of whatsoever character conducted for gain, profit or income and extends to personal service occupations.”
It is the claim of the company that the tobacco so stored was “held in a storage warehouse therein for storage only” and, therefore, could “not be considered to be used in business in this state.” A recital of the salient facts disclosed by the record is necessary to present the basis of the controversy. As stated by the Board of Tax Appeals, “essentially there is no real dispute about the facts, although the interpretation of those facts is in dispute.”
Two kinds of tobacco were stored by the company in its warehouses in Ohio; one kind called “binder” tobacco, which was grown in Wisconsin and shipped to Ohio for storage, the other was so-called “filler” tobacco, which was grown in Pennsylvania and stored in Ohio by reason of a particularly abundant crop in the year 1948. The record shows that cigars manu *155 factured by the company contain three different kinds of tobacco: (1) Filler tobacco which forms the center core or bulk of the cigar, (2) binder tobacco, a single layer of which is around the filler to hold it in shape, and (3) the wrapper, which is on top of the binder completing the outside of, the finished cigar. The first two kinds of tobacco named are involved here.
The Wisconsin (binder) tobacco was delivered to the company’s warehouse in Ohio, packed in wooden cases which were usually 30 inches high, 30 inches wide and varied from three to four feet in length. Upon arrival at the Ohio warehouse, the cases, unopened, were immediately sent to heating rooms where they were kept for periods varying from eight to 10 days for the purpose of preserving the tobacco and preventing the spread of any possible “black rot.” Such action did not involve any curing of the tobacco for that is done immediately prior to the manufacture of the cigars, which manufacture is not in Ohio.
Thereafter the wooden cases were opened and the tobacco taken out, and without undoing the “hands” (a group of leaves fastened together) the tobacco was “aerated” by waving it through the air after the discarding of any damaged leaves. The cases were then repacked and returned to the heating rooms where they remained from eight to twelve weeks during which period the heat was gradually reduced as the weather became warmer. When needed the tobacco is shipped in the same cases, without again opening them, to the place of manufacture of cigars.
The “filler” tobacco, which was raised in Pennsylvania, before being brought into Ohio was sorted into “hands” of the same length, graded and encased in bales. After reaching the warehouse, these “hands” were shaken out, assembled as to size, and, to facilitate handling, packed into cases similar to those used in *156 connection with the Wisconsin tobacco. After being so packed it was also placed in dead storage and nothing whatsoever is done to the cases or the tobacco, before removal from Ohio to the place of manufacture.
The record discloses that during the time of the aerating of the Wisconsin tobacco and the encasing of the Pennsylvania tobacco, leaves found to be inferior were removed, some being salable as scrap to other tobacco manufacturers for use in chewing tobacco.
It is the contention of the Tax Commissioner that a treatment was given the tobacco in Ohio such as to constitute a step in the manufacturing or processing of the company’s product, and that by reason of that fact the tobacco was not held in the warehouse for storage only. However, the company insists that any operation in Ohio was preservative in nature, entirely incidental to storage of the tobacco until it' was taken to the place of manufacture.
The decision of the Board of Tax Appeals is based upon its conclusion that the company placed and kept its tobacco in Ohio warehouses “for the purpose of processing by natural means, aging, thus being transformed into the superior quality deemed necessary by appellant for its cigars, the heat treatment of the Wisconsin tobacco being incidental thereto.”
It is our view that the evidence in the record does not sustain that conclusion. Although, if during the period of storage in a warehouse operations are carried on which would constitute a step in the manufacture of cigars, such storage would not come within the exception stated in the statute, it is equally clear that precautions essential merely to the preservation of a stored product do not constitute processing or a step in the manufacture of the finished product.
In the instant case the tobacco did age and did be *157 come dry but the same thing would be true of grains so stored. Some such precaution is required for the preservation of various commodities, e. g., the sprinkling of stored apples to prevent drying and consequent wrinkling, correct temperatures are essential for wearing apparel, particularly furs, etc., some merchandise, such as paint and other liquids, requires some movement during storage, and numerous other examples.
In the instant case, it seems clear that the interpretation given the phrase, “for storage only,” by the Tax Commissioner and the Board of Tax Appeals is so narrow and restricted as to render the decision unreasonable and unlawful.
The Tax Commissioner and the Board of Tax Appeals cite and rely on the case of Mead Corp. v. Glander, Tax Commr., 153 Ohio St., 539, 93 N. E. (2d), 19. The facts in that case, as disclosed by the opinion by Zimmerman, J., are as follows:
The Mead Corporation was engaged in the manufacture of white paper from wood, and its method of operation involved the bringing of logs into the plant and storing them for seasoning in a so-called wood yard. In this wood yard, after sufficient seasoning, the logs were prepared for what is known as the ‘ ‘ chipper, ’ ’ which reduced the log to small pieces capable of being transformed into pulp. The record shows that the preparation for the chipper consisted of removing the bark from logs, cutting them into smaller lengths, and removing branches and foreign substances.
It was held that the sales and use of tools and accessories used in the wood yard and of the trucks used to transport the wood from the wood yard to the chipper were exempt from taxation because, as stated in the opinion of the court, “the wood used by the appellant in manufacturing paper is not only stored *158 and seasoned” in the wood yard, “but is prepared for the chipper. Processing therefore began in the Avood yard.”
The facts in the Mead case clearly distinguish it from the instant case. The wood yard was the place where the first step in preparing wood for reduction to pulp was carried on, Avhich resulted in a material change in the form and size of the wood by use of mechanical means. This was the first step of the immediate process of transforming wood into paper, and was a part of the process of manufacturing.
This presents a clear contrast with the situation in the instant case. It is disclosed here that heat was applied only to destroy any possible plant disease in the tobacco and Avas followed by aeration for the purpose only of preservation and to prevent deterioration during the period of storage. The record shows also that to prepare the tobacco for its use in manufacturing cigars it goes through a process at the place of manufacture, and that such manufacture is in another state.
To test the claims of the Tax Commissioner, would it be reasonable to grant exemption from taxation to the sales and use of the material used in the handling and boxing of the tobacco, and of the trucks used to haul the tobacco from the warehouses, on the ground that manufacturing had begun and was in process? An answer to that question makes evident the dissimilarity between the Mead case and the instant case.
For the reasons stated, the decision of the Board of Tax Appeals is unreasonable and unlawful and is, therefore, reversed.

Decision reversed.

Middleton, Taft, Hart, Zimmerman and Stewart, J J., concur.